IPSCO, INC. and IPSCO Steel, Inc., Plaintiffs,

and

The Algoma Steel Corp., Ltd. and Sonco Steel Tube Div. Ferrum, Inc., Plaintiffs–Intervenors,

v.

The UNITED STATES, Defendant,

and

Lone Star Steel Company, Defendant–Intervenor.

No. 86–06–00753.

United States Court of International Trade.

May 6, 1988.

Barnes, Richardson & Colburn, Rufus E. Jarman, Jr., Matthew J. Clark, and Karin M. Burke, New York City, for plaintiffs.

Dow, Lohnes & Albertson, William Silverman, Carrie A. Simon, Douglas J. Heffner, Washington, D.C., for plaintiffs-intervenors Sonco Steel.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Platte B. Moring, III, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

Dewey, Ballantine, Bushby, Palmer & Wood, Michael H. Stein, Washington, D.C., for defendant-intervenor.

## OPINION

RESTANI, Judge:

Plaintiffs, IPSCO, Inc. and IPSCO Steel, Inc. (collectively IPSCO), contest a final determination by the United States Department of Commerce, International Trade Administration (ITA) that oil country tubular goods (OCTG) [1] from Canada are being sold in the United States at less than fair value. *Oil Country Tubular Goods from Canada,* 51 Fed.Reg. 15,029 (Apr. 22, 1986), as amended *Oil Country Tubular Goods (OCTG) from Canada* 51 Fed.Reg. 29,579 (Aug. 19, 1986). Before the court is plaintiffs' motion for judgment upon the agency record, pursuant to Rule 56.1 of the rules of this court. Defendant, United States, opposes plaintiffs' motion and seeks affirmance of the administrative determination under challenge.

## BACKGROUND

A petition was filed with ITA in July 1985 on behalf of the domestic OCTG industry alleging that imports of OCTG from Canada were being, or were likely to be, sold in the United States at less than fair value, and that these imports were materially injurious, or threatening to injure, an industry in the United States. *See* 19 U.S. C. § 1673 (1982 & Supp. IV 1986). ITA published notice of its determination to initiate an investigation in August. *Oil Country Tubular Goods from Canada,* 50 Fed.Reg. 33,387 (Aug. 19, 1985).

ITA sent questionnaires to four Canadian OCTG producers under investigation, including IPSCO. After examining the responses of the Canadian companies, ITA issued its preliminary determination that imports of OCTG from Canada were being sold at less than fair value in the United States, and that IPSCO's imports were being dumped at a margin of 40.88 percent. *Oil Country Tubular Goods from Canada,* 51 Fed.Reg. 660, 662 (Jan. 7, 1986).

ITA published its final affirmative antidumping duty determination in April, 1986, finding IPSCO to have sold OCTG in the United States at a weighted average dumping margin of 40.85 percent during the period of investigation. 51 Fed.Reg. at 15,-036. After the United States International Trade Commission issued its final determination of material injury, ITA published an antidumping order requiring the cash deposit of estimated antidumping duties on all entries of OCTG from Canada at the rates set at ITA's final less than fair value determination. *Oil Country Tubular Goods (OCTG) from Canada,* 51 Fed.Reg. 21,782 (Jun. 16, 1986).

In response to complaints that certain clerical errors had been made in ITA's final determination, ITA amended both its June 16 antidumping order and the underlying final determination to reduce plaintiffs' weighted average dumping margin from 40.85 percent to 33.78 percent. 51 Fed. Reg. 29,579.

## ARGUMENTS

Under the Tariff Act of 1930, as amended, dumping margins are measured by calculating the amount by which foreign market value exceeds the United States price of imported merchandise. 19 U.S.C. § 1673 (1982 & Supp. IV 1986). The methods by which foreign market value and United States price are determined are specifically provided for in the Act. 19 U.S.C. §§ 1677a–1677b (1982 & Supp. IV 1986). In the present action, plaintiffs contend that ITA made several errors in determin-

---

[1]. OCTG are hollow steel products of circular cross-section intended for use in drilling for oil or gas. 51 Fed.Reg. at 15,030.

ing and adjusting the foreign market value and United States price of the subject OCTG. Specifically plaintiffs claim that:

(1) ITA's decision to treat limited service OCTG as a fully costed product, rather than as a by-product, in its calculations of cost of production and constructed value is contrary to law, and unsupported by substantial evidence in the administrative record.

(2) ITA improperly failed to amortize all extraordinary costs incurred by IPSCO in the production of OCTG.

(3) ITA improperly failed to exclude merchandise not sold in the ordinary course of trade from its calculation of United States price.

(4) ITA improperly failed to grant IPSCO a circumstance of sale adjustment for its return to stock program.

(5) ITA improperly failed to grant IPSCO a circumstance of sale adjustment for warranty expenses incurred in the home market.

## DISCUSSION

### I. ITA'S TREATMENT OF LIMITED SERVICE OCTG.

■ Where merchandise identical or similar to the imported merchandise is sold or offered for sale in the home market of the country of exportation, ITA calculates foreign market value by resort to domestic prices with certain specified adjustments. 19 U.S.C. § 1677b(a) (1982 & Supp. IV 1986). When there are insufficient sales of the subject merchandise in the home market, or insufficient sales above the cost of production, foreign market value may be determined based on a constructed value of that merchandise. 19 U.S.C. § 1677b(a)(2), (b), (e) (1982 & Supp. IV 1986). In the

present investigation, ITA determined that for certain OCTG products IPSCO had insufficient home market sales above the cost of production to calculate foreign market value entirely on the basis of sales in the home market. Consequently, ITA utilized constructed value for these products.

In calculating constructed value, ITA is obligated to allocate various costs, expenses and profit to the products subject to investigation. 19 U.S.C. § 1677b(e) (1982 & Supp. IV 1986). The products covered by this investigation included OCTG "manufactured to either American Petroleum Institute (API) or non-API (such as proprietary) specifications." 51 Fed.Reg. at 15,030. At issue in this case is ITA's decision to allocate the same cost of production to OCTG not meeting certain specifications (limited service OCTG) as it did to OCTG meeting API or proprietary specifications (prime quality OCTG) in its calculation of constructed value.[2]

Plaintiffs contend that ITA should have treated off-spec limited service OCTG as a by-product of prime quality OCTG for purposes of determining cost of production and constructed value. Plaintiffs specifically proposed that

ITA could value reject material at either the uniform accounting cost utilized by IPSCO for purposes of its cost accounting system; or, alternatively, that the material could be valued at its net actual realizable value. Whichever method was selected would yield an amount to be credited against prime costs consistent with GAAP [Generally Accepted Accounting Principles] and prior ITA practice.

Plaintiffs' Brief at 17–18 (citation omitted). By "averaging in by-products as fully cost-

---

**2.** If the manufactured goods are subjected to quality testing and meet API or proprietary specifications, they may be sold as prime quality goods. It is apparent from the record that the production of prime quality OCTG in this case necessarily generates the production of additional OCTG which ranges in quality from material just below API specifications, to material so seriously defective that it is useful only as "true scrap"—i.e., melting for metal recovery. See Public Record Document Number (PR) 139 at

32–33 (testimony of Mr. Hudek). In calculating constructed value, ITA has treated "true scrap" as a by-product of prime production. See 51 Fed.Reg. at 15,033 (Sonco comment 6).

Less defective material, however, although not suitable for sale as prime OCTG, may be sold, without warranty, as nonprime or limited service OCTG. It is ITA's treatment of this material, which is superior to "true scrap" but inferior to prime goods, that is at issue in this case.

ed prime or first quality merchandise," plaintiffs argue, ITA's method "seriously overstates the cost of production for the reject by-products, and results in by-products invariably being found to be sold below cost...." *Id.* at 11.

Defendant does not dispute plaintiffs' extensive discussion of the proper methodology for costing a by-product. Rather, defendant argues that "[t]he basic dispute between the foreign producers and the United States ... is not one of methodology. It is one of characterization of the merchandise—whether limited service pipe is a by-product of prime quality pipe or a coproduct." Defendant's Brief at 10.

The court agrees with defendant that the issue raised here is one of product characterization. The relevant inquiry which must be addressed by the court is whether ITA's characterization of off-spec limited service OCTG as a co-product, and not as a by-product, of prime quality OCTG is supported by substantial evidence. Neither the statute nor ITA regulations define how ITA is to distinguish between by-products and co-products when conducting its less than fair value investigations.

Generally Accepted Accounting Principles (GAAP)[3] and past ITA practice provide certain broad criteria for distinguishing by-products (including scrap and waste)[4] from co-products (also referred to as the chief or major products) whose production processes and costs they share.

Under GAAP, by-products are considered to be incidental, and of relatively small importance, to the production of the main product; production would not be carried out for their sake alone. E. Kohler, *A Dictionary for Accountants* 70 (4th ed. 1970) ("by-product"); W. Morse & H. Roth, *Cost Accounting* 157 (3d ed. 1986).[5] Specifically, by-products are said to have a relatively low total sales value, as compared with the total sales value of their major co-products. *Id.;* E. Deakin & M. Maher, *Cost Accounting* 275 (1984). The relatively low total sales value of by-products may be due to small output, low unit selling prices, or both. *Id.*

In the past, ITA has relied upon various criteria in determining whether a product should be treated as a by-product, including the importance of a product to the overall economic activity of its producer and the product's value in relationship to the value of the primary product. *Red Raspberries from Canada,* 50 Fed.Reg. 19,768, 19,769 (May 10, 1985) (juice stock raspberries, representing a significant portion of the revenue and production of a producer's frozen berry business, were not treated as by-products); *Unrefined Montan Wax From the German Democratic Republic,* 46 Fed. Reg. 38,555, 38,556 (July 28, 1981) (montan wax, whose sales were an important part of the economic activity at a facility, was found not to be a by-product of the produc-

**3.** For purpose of making other determinations under the antidumping laws, Congress has approved use of generally accepted accounting principles. For example, the legislative history of the Trade Act of 1974, in which Congress enacted a provision requiring ITA to disregard sales in the home market of the country of exportation that are made at less than cost of production when calculating foreign market value, states that:

in determining whether merchandise has been sold at less than cost, the Secretary will employ accounting principles generally accepted in the home market of the country of exportation if he is satisfied that such principles reasonably reflect the variable and fixed costs of producing the merchandise.

H.Rep. No. 571, 93rd Cong. 1st Sess. 71 (1973). *See* 19 U.S.C. § 1677b(b) (1982).

**4.** Although by-products, scrap and waste may be afforded similar accounting treatments, they are

distinguished in terms of relative value and processing. By-products, on the one hand, have a positive "net realizable value" (i.e. their sales value exceeds the cost of the additional processing and marketing). W. Morse & H. Roth, *Cost Accounting* 157 (3d ed. 1986); E. Dean and M. Maher, *Cost Accounting* 276 (1984). Accordingly, they may be subjected to additional processing to make them more saleable. Scrap and waste, on the other hand, generally have a negative "net realizable value," and thus, are sold "as is," without additional processing. *Id.*

**5.** None of the parties has argued that generally accepted accounting principles in the United States and Canada differ in this respect.

For purposes of this discussion, the distinctions drawn in GAAP are used in allocating production costs among products produced simultaneously from a single set of inputs.

tion of energy in the form of mined lignite, fuel briquettes, and electricity); *Fall–Harvested Round White Potatoes from Canada*, 48 Fed.Reg. 51,669, 51,673–74 (Nov. 10, 1983) (comment 17) (hay and grain rotation crops found to be by-products where their value was small in relation to potatoes). Other criteria articulated by ITA have focused on issues related to whether a product requires, or is subjected to, separate and additional processing and marketing.[6] *See Titanium Sponge from Japan*, 49 Fed.Reg. 38,687, 38,688–89 (Oct. 1, 1984) (comment 5) (titanium tetrachloride found to be an intermediate product, not a by-product, where "(1) it was manufactured in separate facilities, (2) the quantity of production could be determined by management and is not determined by the production of titanium sponge, and (3) its production was not an unavoidable consequence of the manufacturing of titanium sponge."); *Unrefined Montan Wax*, 46 Fed.Reg. at 38,556 ("a significant investment has been made in a sizable plant to extract and market montan wax. The extraction of montan wax is not essential to the production of energy from lignite."). *But see Frozen Concentrated Orange Juice from Brazil*, 51 Fed.Reg. 8,324, 8,328–29 (Mar. 17, 1987) (comment 11) (distinguishing *Titanium Sponge* and finding that animal feed pellets, processed from pulp and rinds, which in turn were unavoidable consequences of orange juice production, were by-products, not co-products).

In this case, defendant states that ITA considered the following three factors in arriving at its determination that limited service OCTG is not a by-product of prime OCTG:

1. cost of production of the pipe;
2. sales value of the pipe; and
3. use of the pipe.

Defendant's Brief at 11. Defendant does not provide any citations to the record which indicate that ITA did, in fact, consider each of these factors with respect to IPSCO.

In ITA's final determination, the discussion of whether limited service OCTG in this case was a by-product of prime OCTG was limited to a single factor—use of the pipe.[7] In response to IPSCO's comment, ITA stated:

> Because the off-spec merchandise is used as OCTG and can be very similar to prime merchandise, we have included it in this investigation and made comparisons of United States price with foreign market value for sales of off-spec merchandise. In order to allow such comparisons, we rejected Ipsco's methodology of treating off-spec production as a by-product.

51 Fed.Reg. at 15,036 (IPSCO comment 7). *See id.* at 15,033 (Sonco comment 6) ("We treated scrap and rejects as by-products. The limited service OCTG, which has the same use as the prime quality product, was not treated as a by-product.").

The record indicates that ITA may have considered factors other than use, at least initially, with respect to plaintiff-intervenors, Sonco. CR 64, at [2265A][8] (Sonco

---

**6.** Note, however, that these criteria may be more relevant to distinguishing scrap or waste (which have no "net realizable value" and are sold "as is") *see supra* note 4, from other products, including by-products, co-products and intermediate products.

**7.** It is apparent from the record that IPSCO sells limited service pipe to users and distributors of OCTG for applications often similar to those of prime quality pipe, although not warranting the products for API specifications. Each sales invoice for limited service OCTG IPSCO sells in the United States states that limited service OCTG "may be expected in most cases to accept standard drift and hydrostatic test pressures up to 3,000 psi but no warranty or guarantee can be provided in this regard." PR 60, at 5. In addition, IPSCO explained the uses of its "reject" materials during ITA's hearing as follows:

> Well, our reject material encompasses an entire range of product. It goes from material which is severely off specification; that is, it could be bent, it could have holes cut in it, it may not even be welded along the seam, to material which, although it has failed to meet the intended specification, nevertheless could be used in applications such as piling or structurals *or even as below spec OCTG, which we and the industry call limited service.*

PR 139, at 32–33 (testimony of Mr. Hudek) (emphasis added).

**8.** Bracketed numbers indicate microfilm frame numbers and are used where a record doc-

verification report, accountant's letter dated April 14, 1986). *But see,* 51 Fed.Reg. at 15,033 (Sonco comment 6). It does not indicate, however, that these other factors were ever considered with respect to IPSCO. Although defendant argues that the record provides support for finding that these factors justified ITA's treatment of limited service OCTG, even this is not so clear. The portion of the record cited by defendant demonstrates that, with respect to at least one OCTG product, there were some wide discrepancies between prime and limited service in terms of total sales values (reflected in both output and unit prices) and total costs of production (reflected largely in output). CR C–37 (IPSCO Verification Exhibits—Cost of Production) (oilwell tubing).[9]

If ITA has, in fact, based its determination with respect to plaintiff-intervenors Sonco, upon certain factors which it has not considered in regard to IPSCO, and which might warrant a different outcome, ITA is acting inconsistently. In any event, the court cannot discern from the determination what standard is actually being applied in making the co-product/by-product distinction and, if it differs from former agency or GAAP standards, why it is being applied. Before the court can determine if defendant has relied on substantial evidence, it must be able to discern if the criteria which are applied are reasonable. Accordingly, this matter is remanded to ITA for reconsideration and for a fuller explanation of the basis for whatever by-product/co-product choice it makes.

## II. AMORTIZATION OF EXTRAORDINARY COSTS.

In establishing the foreign market value of merchandise based upon its constructed value, ITA looks to those costs "which would ordinarily permit production of that particular merchandise in the ordinary course of business." 19 U.S.C. § 1677b(e)(1)(A) (1982). Thus, it is the task of ITA in calculating constructed value to arrive at the ordinary or typical cost in the country of export of producing the article subject to investigation. In this case ITA "normalized" certain extraordinary costs "in keeping with the Department's policy of amortizing startup costs over future production." 51 Fed.Reg. at 15,032. In the past, ITA has stated that it will account for startup and product development costs, so long as they are appropriately justified, supported and quantified. *Cellular Mobile Telephones and Subassemblies from Japan,* 50 Fed.Reg. 45,447, 45,452, 45,455 (Oct. 31, 1985) (OKI comment 10 and Toshiba comment 5). *See Titanium Sponge from Japan,* 49 Fed.Reg. 38,687, 38,690 (Oct. 1, 1984) (comment 19) (ITA interpretation of statutory-basis for adjustment).

In support of their claim that they incurred extraordinary expenses associated with new product development and the start-up of new equipment during the period of investigation, plaintiffs provided ITA with evidence in the form of budgeted standard cost estimates and yield data pertaining to the products at issue. ITA rejected IPSCO's cost estimates stating that:

> The normalized cost information submitted by IPSCO is based on standard costs contained in Ipsco's annual management budget adjusted for inflation using a broad index of price levels. The standard costs contained in the budget are not used by Ipsco in its cost accounting system. This information is not sufficient to substantiate the level of production costs under normal operating conditions.

51 Fed.Reg. at 15,036 (comment 6).

Defendant argues that because ITA could not verify that "[t]he theoretical data" submitted by plaintiffs "represented

---

ument's own page numbers are otherwise unavailable or ambiguous.

9. Other OCTG products were differentiated by grade, when listed as prime, but not when listed as limited service. C–37 (IPSCO Verification Exhibits—Cost of Production) (oilwell casing). Accordingly, comparisons vary depending upon

which particular grade of prime quality oilwell casing is being compared to limited service oilwell casing. If all grades of prime quality oilwell casings are compared cumulatively to the listing for limited service oilwell casing, total sales values and total costs of production vary significantly. *Id.*

the cost of production under normal operating conditions," it properly refused to rely on that data. Defendant's Brief at 17–18. Plaintiffs respond that:

the nature of the extraordinary costs claimed by IPSCO are not susceptible to a statement of actual costs under normal operating conditions since neither new equipment nor products, by their nature, were previously used or made by the company and hence had not been operated or produced under "normal" operating conditions at the time the information was given.

Since a producer has no historic basis upon which to state what the normal operating conditions for new equipment and new products will be, the most that a producer can possibly provide is its estimate of what costs will be when normal operating conditions are achieved.

Plaintiffs' Reply Brief at 11.

■■■ Value determinations made in antidumping cases "must be based upon proof of *actual* costs of prices—*not* estimates, approximations or averages." *F.W. Myers & Co. v. United States,* 72 Cust.Ct. 219, 234, 376 F.Supp. 860, 873 (1974) (citation omitted). Accordingly, ITA has in previous cases refused to permit "adjustment of actual costs incurred to a hypothetical efficient production cost model" when determining cost of production. *Titanium Sponge from Japan,* 49 Fed.Reg. at 38,-689. Thus, in this case, ITA acted in accordance with law when it refused to rely on data which consisted only of plaintiffs' hypothetical model of what costs of production would be once normal operating conditions were achieved. ITA apparently was not seeking the impossible, but merely rejecting data not tied to any actual experience.

Where additional data was made available by plaintiffs to demonstrate the existence of extraordinary costs, ITA did make an adjustment. As indicated, plaintiffs submitted yield data in support of their claims of extraordinary costs. Recognizing that "Ipsco incurred abnormally high costs for certain products which it recently started producing," ITA made an adjustment

for the extraordinary costs which resulted from initial production runs of certain experimental products. 51 Fed.Reg. at 15,-032 (comment 15). For these products, ITA amortized extraordinary production costs over present and future production of OCTG. *Id.* (comment 16). For certain other products, however, ITA apparently determined that the information submitted by plaintiffs did not substantiate their claim for an adjustment based on extraordinary costs. Plaintiffs challenge this decision.

Plaintiffs argue that "ITA offered no justification in the contested determination for rejecting plaintiffs' yield calculations for these other OCTG grades while accepting those performed for their new products," Plaintiffs' Brief at 32, and that ITA's decision to distinguish between these products is "arbitrary in the extreme." *Id.*

The court disagrees. While the ITA determination does not discuss this issue in detail, the path of ITA's reasoning is discernable from the record and provides a non-arbitrary basis for the differing results. ITA focused on experimental and new products and explained, generally, that "At verification, information was gathered regarding yield rates during and after the period of investigation. Where such information was available, the low yield rates in the period of investigation were normalized, in keeping with the Department's policy of amortizing startup costs over future production." 51 Fed.Reg. at 15,032 (petitioner's comment 15). *See id.* at 15,036 (IPSCO's comment 6).

Upon review of the administrative record, it is apparent that ITA had reason to distinguish between the products at issue. In response to ITA's letter of November 19, 1985, requesting specific information to supplement plaintiffs' original questionnaire response, plaintiffs submitted data which included descriptions of certain products which they believed incurred extraordinary costs during the period of investigation. CR 19, [2237A–42A]. This information describes two products in considerable detail which were the subject of small, experimental production test runs, produced with newly installed equipment,

and not offered for sale on a normal commercial basis during the period of investigation. *Id.* For these products ITA concluded that yield rates alone were sufficient evidence of the extraordinary costs incurred. 51 Fed.Reg. at 15,032, 15,036 (petitioner's comment 15 and IPSCO's comment 6).

The data submitted by plaintiffs concerning the other two products at issue is less specific. CR 19, at [2237A–42A]. One product is not specifically discussed,[10] while the other product is said to have incurred abnormal non-recurring costs because those "grades require [additional processing] to meet the specification in IPSCO's process route." *Id.* at [2238A]. Plaintiffs' subsequent explanations to this court, which they assert were fully explained to ITA, focus on the nature of the specifications to which the products were manufactured, as well as the "coincident" introduction of "new production equipment, specifically a new electric furnace." Plaintiffs' Reply Brief at 9–10.[11]

The court does not deny that extraordinary costs may be associated with the start-up of new equipment or the difficulties of a particular process, and that such costs might justify adjustments such as those requested by plaintiffs. The burden is on plaintiffs, however, to present sufficient evidence to substantiate their claims; that is, to substantiate the appropriateness, as well as amount, of their claimed adjustment. Under the standard of review applicable to these cases, the court cannot say that ITA erred in finding this burden was not carried.

### III. U.S. SALES "NOT IN THE ORDINARY COURSE OF TRADE."

■ Plaintiffs next argue that ITA erred in failing to exclude from the determination of United States price certain merchandise which they claim was "not sold in the ordinary course of trade in the United States because of the experimental nature of their production and the limited quantity and onetime availability of such merchandise." Plaintiffs' Brief at 33–34 (citation omitted). Plaintiffs ask the court to remand this action to ITA with directions to determine whether the sales at issue were made in the ordinary course of trade. Plaintiffs' Reply Brief at 18. It is ITA's position in this case that the concept of "[o]rdinary course of trade is not applicable to U.S. sales." 51 Fed.Reg. at 15,033 (Sonco comment 1).

Foreign market value is defined, in part, as follows:

> The foreign market value of imported merchandise shall be the price ...—
>
> (A) at which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principle markets of the country from which exported, in the usual commercial quantities and *in the ordinary course of trade for home consumption....*

19 U.S.C. § 1677b(a)(1)(A) (Supp. IV 1986) (emphasis added). Similarly, ITA's regulations provide that, in calculating foreign market value, it will consider only sales that are made in the ordinary course of trade. 19 C.F.R. § 353.3 (1987).

As plaintiffs acknowledge, no parallel provision regarding sales made in the ordinary course of trade can be found in the statutory definition of United States price, 19 U.S.C. § 1677a (1982 & Supp. IV 1986), nor in ITA's regulation defining United States price. 19 C.F.R. § 353.10 (1987). Both the statute and ITA regulations contain a detailed methodology for calculating foreign market value and United States price. Congress has provided for numerous adjustments, allowances and exclusions on each side of the fair value equation in

---

**10.** This product is apparently encompassed by the broad explanation that "There are other types of products whose costs reported in Table I–2 are not realistic and should not be used in assessing margins. These are products produced at the Calgary Mill during the volatile period of January to September, 1985." CR 19, at [2241A].

**11.** In addition, plaintiffs claim that they first began producing one of these products shortly before the period of investigation and were still learning to produce this product efficiently during the period of investigation. Plaintiffs' Brief at 33.

order to insure the fairest possible comparison between markets. *Smith–Corona Group v. United States*, 713 F.2d 1568, 1578 (Fed.Cir.1983) *cert. den.* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). In light of this detailed framework, the court may assume that if Congress intended to require the administering authority to exclude all sales made outside the "ordinary course of trade" from its determination of United States price it could have provided for such an exclusion in the definition of United States price, as it has in the definition of foreign market value. It has not done so.

Plaintiffs claim that "there is evidence in the legislative history of a recognition on the part of Congress that certain categories of merchandise which would be considered not sold in the ordinary course of trade if sold in a home or third country market are not to be included in the determination of U.S. price in a dumping investigation." Plaintiffs' Brief at 34–35. Plaintiffs have failed, however, to cite any portion of relevant legislative history in support of this specific proposition. Plaintiffs have only cited certain sections of the House and Senate Reports on the Trade Act of 1974 which they claim demonstrate that Congress recognized the "inherent incomparability" of sales of clearance, year end and obsolete merchandise relative to normal transactions of the subject merchandise. Plaintiffs' Brief at 35 (citing S.Rep. No. 1298, 93rd Cong., 2d Sess. 173, *reprinted in* 1974 U.S. Code Cong. & Admin. News 7186, 7310 and H.R.Rep. No. 571, 93rd Cong., 1st Sess. 71 (1973)).

The court finds plaintiffs' reliance upon the 1974 legislative history unpersuasive. The passages cited by plaintiffs are concerned with an amendment to foreign market value, currently codified at 19 U.S.C. § 1677b(b) (1982), which provided for disregarding certain home market sales in determination of foreign market value, and for the use of cost of production data. This legislative history is not relevant to ITA's separate determination of United States price. To the extent that Congress touched upon the issue of the comparability of certain sales relative to "normal" trans-

actions, it rejected the position which plaintiffs hold in this case. The only types of sales which it identified as outside of normal business practice where systematic sales, over an extended period of time, of substantial quantities, at prices which would not permit recovery of all costs within some reasonable period of time. S.Rep. No. 1298, U.S.Code Cong. & Admin.News 1974 p. 7186, *supra;* H.R.Rep. No. 571, *supra. See* 19 U.S.C. § 1677b(b)(1)–(2). It viewed these sales as inappropriate for comparison with sales in the United States, and provided for their exclusion from foreign market value. Other sales, however, including sales of obsolete or year-end clearance merchandise, as well as sales of certain merchandise requiring large development costs at prices which would cover those costs within a reasonable period, were considered to be within the range of normal business practices, and therefore were not to be excluded from foreign market value. S.Rep. No. 1298, U.S.Code Cong & Admin.News 1974 p. 7186, *supra;* H.R. Rep. No. 571, *supra.*

Thus, plaintiffs' argument that under the statutory scheme the sales at issue must be excluded in order to make a fair comparison fails. In addition, in this case, ITA acknowledged the "experimental nature" of two of these products and made adjustments for the extraordinary costs associated with their production when it calculated foreign market value. *See* discussion, *supra,* at part II. As the extraordinary nature of these products has already been factored into the foreign market value side of the equation, it would seem inconsistent to exclude sales of these same products from the United States price side of the equation. Thus, it does not appear that plaintiffs' position would result in a fairer comparison than ITA has made.

Plaintiffs also argue that ITA's refusal to apply the concept of ordinary course of trade to United States sales contradicts past ITA policy and precedent. Neither defendant nor defendant-intervenor has responded to this argument. It is unclear whether ITA's broad statement in this case that "ordinary course of trade is not appli-

cable to U.S. sales" indicates its abandonment of any past policy or practice allowing disregard of non-ordinary course of trade sales under certain limited circumstances. Although the court sees possible bases for distinguishing the cited precedent,[12] the precedent nonetheless reflects a view that the agency has some discretion in this area. Because of the cryptic explanation in ITA's determination and defendant's lack of response on this point, the court cannot tell if ITA is adhering to its past views and merely making what would seem a reasonable determination to include the sales at issue here, or whether it has totally abandoned past precedent and is now arguing that it *must* include all U.S. sales not made in the ordinary course of trade. As this matter is remanded for other purposes, a clarification would seem to be in order. Accordingly, the court directs ITA to further explain its determination in this regard.

## IV. CIRCUMSTANCES OF SALES ADJUSTMENT FOR IPSCO'S RETURN TO STOCK PROGRAM IN CANADA.

■ Under the statute, adjustments may be made to foreign market value "if it is established to the satisfaction of the administering authority that the amount of any differences between the United States price and the foreign market value ... is wholly or partly due to— ... differences in circumstances of sale." 19 U.S.C. § 1677b(a)(4)(B) (1982). Pursuant to this authority, ITA regulations state that:

(a) *In general.* In comparing the United States price with the sales, or other criteria applicable, on which a determination of foreign market value is to be based, reasonable allowances will be made for bona fide differences in the circumstances of the sales compared to the extent that it is established to the satisfaction of the Secretary that the amount of any price differential is wholly or partly due to such differences. Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a direct relationship to the sales which are under consideration.

19 C.F.R. § 353.15(a) (1987). Accordingly, expenses must be related to specific sales at issue—sales of certain products, during a certain period of time—rather than to sales generally. *See Rhone Poulenc, S.A. v. United States,* 8 CIT 47, 63–68, 592 F.Supp. 1318, 1333–36 (1984).

Plaintiffs claim that ITA erred when it failed to make a circumstance of sale adjustment in its calculation of foreign market value of the subject OCTG for costs associated with IPSCO's "return to stock program." The return to stock program at issue

permits a purchaser to return any unused merchandise for full credit at the original sale price without cause, that is, without a requirement that the product be defective or otherwise nonconforming.

Policy Papers No. 27 ("Treatment of Sales of Obsolete, Year End and Clearance Merchandise"). The paper acknowledges that in a number of situations it may nonetheless be necessary to utilize such sales and specifically states that "a high proportion of so-called 'clearance' merchandise sold to the U.S. may indicate a clear case of dumping." *Id.* (citing *Motorcycles from Japan,* 43 Fed.Reg. 35,140, 35,141 (Tres. Dep't Aug. 8, 1978) (final determination) (model year adjustment)). This paper does not establish the existence of a general ITA policy of excluding from the determination of United States price merchandise which is not sold in the ordinary course of trade. Finally, *Certain Dried Heavy Salted Codfish from Canada,* 50 Fed.Reg. 20,819 (May 20, 1985) (final determination), appears to be consistent with the policy paper and involves peculiar facts, not relevant here.

12. One of the two previous ITA determinations cited by plaintiffs appears to be concerned with the issue of whether a certain product was within the scope of ITA's investigation generally and not the more limited issue presented here of whether goods determined to be within the scope of the investigation should, nonetheless, be excluded from ITA's calculation of United States price because they may have been sold outside the ordinary course of trade. *Certain Stainless Steel Sheet and Strip Products from Spain,* 49 Fed.Reg. 35,538 (Sep. 10, 1984) (final determination). As defendant notes, plaintiffs do not challenge the scope of this investigation. Defendant's Brief at 21 n. 24. Another source cited by plaintiffs contains only a suggestion that ITA investigators should "whenever possible" not utilize sales of obsolete, year end and clearance merchandise in calculating United States price and foreign market value. ITA,

This policy applies to all IPSCO OCTG sales in Canada, is stated and known at the time of sale, and is used by IPSCO as an incentive in its marketing.

Plaintiff's Brief at 40. No comparable policy applies to IPSCO's United States sales.

Defendant responds that plaintiffs did not provide ITA with data sufficient to establish that the amount claimed as an adjustment bears a direct relationship to the sales under investigation. Defendant's Brief at 28. Because "[p]laintiffs' data did not indicate that the returned merchandise was part of the OCTG that Commerce was investigating.... Commerce properly denied the claimed circumstance of sale adjustment." *Id.*

As indicated by the language of the statute and ITA regulation set forth above, plaintiffs have the burden of demonstrating to ITA that they are entitled to circumstance of sale adjustments for expenses directly related to the sales under investigation. *Rhone Poulenc,* 8 CIT at 64, 592 F.Supp. at 1333. The importance of requiring proof of this direct relationship is explained in the legislative history of the Trade Agreements Act of 1979:

> if adjustments are improperly made, the result may be an unjustifiable reduction in or elimination of the dumping margin. Therefore, the Committee intends that adjustments should be permitted if they are reasonably identifiable, quantifiable and *directly related to the sales under consideration* and if there is clear and reasonable evidence of their existence and amount.

H.R.Rep. No. 317, 96th Cong. 1st Sess. 76 (1979) (emphasis added). In this case, ITA apparently determined that plaintiffs had not met this burden and denied the adjustment.[13]

The record indicates that ITA was provided with, and verified, certain data concerning the cost of operating IPSCO's return to stock program. CR 65, at 17–19; CR C–48 (IPSCO Verification Exhibits—Cost of Production). The verification report states, in the general selling and administrative (GS & A) expenses section, that "[e]xpenses related to the return to stocks program are incorporated in overall GS & A expenses." CR 65, at 18. Circumstances of sales adjustments are made for direct, but not for indirect, sales expenses. *Rhone Poulenc,* 8 CIT at 68–70, 592 F.Supp. at 1336–38; *Consumer Prod. Div., SCM Corp. v. United States,* 753 F.2d 1033 (Fed.Cir.1985).[14]

It is unclear whether IPSCO has segregated its expenses for the return to stock of OCTG under investigation from any expenses which it may have incurred for the return to stock of other products not under investigation.[15] To the extent that this is the case, a circumstances of sales adjustment would not be warranted. *Rhone Poulenc,* 8 CIT at 68, 592 F.Supp. at 1336.

Finally, plaintiffs do not deny that a portion of the merchandise returned during that period was merchandise sold prior to the period of investigation—sales unrelated to the subject investigation—but argue that ITA's determination should nevertheless have been based upon whatever mer-

---

**13.** Plaintiffs argue additionally that the determination should be remanded to ITA because the agency did not explain its reasons for denying this adjustment in the determination. As the court could not find support in the record upon which ITA could allow this adjustment, further explanation from ITA would not be helpful.

**14.** Although adjustments to foreign market value for indirect sales expenses may be made under ITA's exporter's sales price offset regulation, 19 C.F.R. § 353.15(c) (1986), this adjustment would be limited to the amount of any indirect sales expenses adjusted for in the determination of exporter's sales price under United States price. *Consumer Prod. Div., SCM.*

**15.** Although some of the figures appearing in IPSCO's submission are clearly labeled as relating to OCTG sales, other figures refer generally to "Total Costs," "Returns vs Total Transaction[s]" and "Total Cost of Returns." CR C–48, *supra.* Plaintiffs do not argue that their data is, in fact, based entirely upon sales and returns of only the OCTG products under investigation. Although they do state that their cost figures are based upon "home market OCTG sales occurring during that period [February to July, 1985] and the volume of *pipe* returned during that period," Plaintiffs' Reply Brief at 20 (emphasis added), it is unclear whether the "volume of pipe returned" is limited entirely to the OCTG products under investigation.

chandise happened to be returned during the period of investigation.

As this court has stated, "[p]laintiffs ... need not attribute each expense claimed to a particular sale in order to qualify for a circumstances of sale adjustment." *Rhone Poulenc*, 8 CIT at 66, 592 F.Supp. at 1334 (citation omitted). Such a standard of proof would be too narrow. Reliance on such a standard, however, is not necessary in order to properly deny this adjustment. If, in fact, the cost of the return to stock program is a cost which IPSCO factors into each and every one of its Canadian sales, plaintiffs should be able to establish the existence of this cost and its relationship to prices in the home market through the use of historical data. The record reveals only a general expense based on returns, which may have no relation to sales made during this, or any equivalent, time period.

Thus, the court does not hold that an additional cost factor is not uniquely present in IPSCO's Canadian sales due to the return to stock program, only that the data submitted by plaintiffs did not adequately establish the connection between such costs and the specific merchandise subject to this investigation. ITA's decision to deny this adjustment on the basis of the information submitted was, therefore, in accordance with law.

### V. CIRCUMSTANCES OF SALES FOR IPSCO'S WARRANTY EXPENSES IN CANADA.

Plaintiffs finally argue that ITA erred in refusing to grant a circumstance of sale adjustment for certain warranty expenses incurred in the home market. Specifically, plaintiffs assert that the correction performed by ITA in the amended determination had the effect of inadvertently negating the proper adjustment for differences in the circumstances of sale for warranty expenses. Defendant responds that plaintiffs' argument is based upon a misunderstanding of the computer program used by ITA in its calculations, and that plaintiffs received a circumstance of sale adjustment for warranty expenses incurred in the home market in both the original and

amended final determination. The administrative record supports this conclusion, CR 93, at [2979A], and plaintiffs do not contest it in their reply brief.

### CONCLUSION

This determination is remanded for reconsideration consistent with this opinion. A new determination is to be issued within 20 days.

SO ORDERED.