IPSCO, INC. and Ipsco Steel, Inc., Plaintiffs,

and

The Algoma Steel Corp., Ltd. and Sonco Steel Tube Div. Ferrum, Inc., Plaintiff–Intervenors,

v.

The UNITED STATES, Defendant,

and

Lone Star Steel Company, Defendant–Intervenor.

Court No. 86–06–00753.

United States Court of International Trade.

May 18, 1989.

Barnes, Richardson & Colburn, Rufus E. Jarman, Jr., Karin M. Burke, Josephine N. Belli, New York City, for plaintiffs.

Dow, Lohnes & Albertson, William Silverman, Carrie A. Simon, Douglas J. Heffner, Washington, D.C., for plaintiff-intervenor Sonco Steel.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Platte B. Moring, III, Civil Div., U.S. Dept. of Justice, Craig L. Jackson Atty.–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., for defendant.

Dewey, Ballantine, Bushby, Palmer & Wood, Michael H. Stein, Audrey Winter and Akin, Gump, Strauss, Hauer & Feld, Warren E. Connelly, Valerie A. Slater, and Angela J. Paolini, Washington, D.C., for defendant-intervenor.

## OPINION

RESTANI, Judge:

Plaintiffs, Ipsco, Inc. and Ipsco Steel, Inc. (Ipsco) bring this action challenging the final determination by the United States Department of Commerce, International Trade Administration (ITA) that oil country tubular goods (OCTG) from Canada are being sold in the United States at less than fair value. *Oil Country Tubular Goods from Canada*, 51 Fed.Reg. 15,029 (Apr. 22, 1986), as amended 51 Fed.Reg. 29,579. In its opinion of May 6, 1988, *Ipsco, Inc. v. United States*, 12 CIT ——, 687 F.Supp. 633, the court remanded this action to ITA for reconsideration and a fuller explanation of the agency's reasons for treating limited service OCTG as a fully costed co-product of prime OCTG in its calculations of constructed value[1] and for a clarification of the agency's treatment of certain experimental merchandise exported to the United States. In its Remand Determination of September 2, 1988 (Remand Determination), ITA upheld its previous determination with regard to these two issues. Plaintiffs presently challenge these remand results.

## DISCUSSION

### I. ITA'S TREATMENT OF LIMITED SERVICE OCTG

In the previous opinion, the court ordered ITA to reconsider and explain why it had chosen to treat limited service OCTG as a fully costed co-product of prime quality OCTG in its calculations of constructed value rather than as a by-product of prime as requested by plaintiffs in their submissions to the agency. In the remand determination, after considering the use of the prod-

---

1. Constructed value, which is based on cost of production is utilized as foreign market value when there are insufficient sales in the home market above cost of production. *See* 19 U.S.C. § 1677b(b) and (e) (1982 & Supp. IV 1986).

uct and "whether the costs of production and sales value of the product are treated under Generally Accepted Accounting Principles ("GAAP") as co-products or by-products of the chief product," ITA determined that limited service OCTG is properly classified as a co-product of prime OCTG.[2] Remand Determination at 3.

In analyzing cost of production and sales value, ITA relied considerably on its finding that Ipsco treated its limited service pipe as a co-product of prime OCTG in certain financial statements which it claims are based on GAAP. In those statements, Ipsco did not accord limited service pipe by-product accounting treatment. Instead, the financial statements relied upon assign limited service pipe significant sales value and costs, both of which are reported along with the costs and sales value of the chief product. Such reporting, ITA concludes, is consistent with GAAP treatment of co-products. ITA acknowledges that Ipsco does not treat limited service OCTG as a co-product in its cost accounting system, but disregards this information because "Ipsco is not required to employ GAAP for its internal accounting." Remand Determination at 6 n. 7.

Ipsco contests ITA's findings on this issue and claims that it did not treat limited service OCTG as a co-product for purposes of its financial statements. Ipsco claims that its cost accounting system, which was disregarded by ITA and which treats limited service pipe as a by-product, is prepared in accordance with GAAP. Furthermore, Ipsco contends that the financial statement relied on by ITA was an internal document for use by Ipsco for its own purposes and was not prepared in accordance with GAAP. Specifically, Ipsco claims that the cost figures would have to be adjusted downwards in order for the figures contained in this statement to comply with GAAP.

Briefing and argument following remand, however, have demonstrated that answering the question of whether limited service OCTG is properly categorized as a by-product or co-product of prime OCTG does not resolve the pertinent issue before the court, that is, how cost of production and constructed value should be calculated for purposes of the antidumping laws if two differently valued and priced products are produced by the same production process. Before GAAP or any other ordinary costing methodology is used, ITA must determine if the statute, either expressly or impliedly, directs ITA to calculate cost of production and constructed value in some other way.

Plaintiffs do not contest the fact that limited service OCTG is subject to this investigation. In order for ITA to make the fair value comparisons required by law, ITA is obligated to arrive at a foreign market value for such limited service OCTG. Both the GAAP by-product accounting methodology proposed by plaintiffs and the equal allocation accounting methodology employed by ITA lead to a number of problems in this regard.

### A. Plaintiffs' proposed by-product accounting methodology

Throughout these proceedings, plaintiffs have suggested two alternative methods for calculating constructed value. Plaintiffs proposed that ITA value limited service OCTG at either the uniform accounting cost utilized by Ipsco for purposes of its cost accounting system (an amount equal to the estimated market value of limited service OCTG) or alternatively, that such OCTG be valued at its actual net realizable value. Either method, plaintiffs argue, would yield an amount to be credited against prime cost, consistent with GAAP and prior ITA practice. Plaintiffs further argue that the values which the by-product methodology yields should serve as the basis for foreign market value of the limited service product.

Plaintiff's proposed methodology must be rejected. In reaching this conclusion,

**2.** Simply put, under Generally Accepted Accounting Principles (GAAP) utilized in the United States the value of by-products is generally deducted from the other costs of producing the prime products, while costs are generally allocated among co-products. *See* C. Horngren, *Cost Accounting: A Managerial Emphasis,* 531–544 (5th ed. 1982).

the court notes the significance of the fact that both primary and secondary OCTG products[3] are subject to investigation in this case. In cases where either cost of production or constructed value is relevant to calculation of foreign market value, where secondary products are not subject to investigation, and where those secondary products may properly be characterized as by-products, plaintiffs' proposed methodology of deducting the value of the by-product from the other costs of production of the prime product would most certainly be reasonable and is, in fact, ITA's approach. *See, e.g., Fall–Harvested Round White Potatoes from Canada,* 48 Fed.Reg. 51,669, 51,673–74 (Nov. 10, 1983). The task of ITA in such cases is to examine the cost of producing the prime product. In such cases, ITA is not obligated to examine the cost of producing the secondary product. That is, the secondary product's statutorily defined foreign market value need not be determined, because no antidumping margin need be calculated for such product. In this case, however, ITA was required to determine the foreign market value of the limited service product.

Plaintiffs have failed to cite any statutory authority supporting their contention that ITA simply may assign limited service OCTG a foreign market value based on its net realizable value or estimated market value. Rather, both the statute and ITA regulations set forth specific cost, expense and profit elements which must form the basis of constructed value. Plaintiffs' proposed methodology ignores these factors.

## B. ITA's accounting methodology

Having concluded that the methodology proposed by plaintiffs would be contrary to law, the court is left to examine the approach taken by ITA to determine whether it is a reasonable application of the controlling law. ITA determined that limited service and prime OCTG are properly characterized as co-products and treated the products identically in its calculations of foreign market value. Even assuming *arguendo* that limited service OCTG is properly characterized as a co-product of prime, the court is unpersuaded that this would dictate the type of equal costing treatment employed by ITA and challenged by plaintiffs. Authorities on accounting seem to be in agreement that shared costs must be allocated between co-products or joint products,[4] as opposed to the treatment afforded by-products. *See, e.g.,* W. Morse and H. Roth, *Cost Accounting,* 147–162 (3rd ed. 1986). The authorities do not indicate, however, that co-products must be costed in an identical manner or that such costs must or should be allocated equally. Rather, they indicate that costs are normally allocated between the products according to various factors, including sales value. *See* C. Horngren, *Cost Accounting: A Managerial Emphasis,* 531–534 (5th ed. 1982) (stating that there are a number of methods for allocating costs between joint-products, the most common of which "allocate in proportion to some measure of the relative revenue-generating power identifiable with the individual products.") This most common allocation methodology would seem particularly appropriate in the context of a statutory scheme which is concerned with fair pricing. That is, ITA must choose an accounting methodology which fulfills the statutory purpose. Methodologies which may be acceptable for certain accounting purposes are not necessar-

3. The court uses the term "secondary" as a matter of convenience to describe the lower value limited service product. The court does not thereby decide whether limited service OCTG is a by-product or a co-product of prime OCTG.

4. In its latest brief to the court, defendant admits that "allocation methodology would be appropriate in [a] joint products situation," but argues that the term "joint products" does not apply in this case because limited service and prime OCTG are not separately identifiable as distinct individual products but are instead the same OCTG product distinguishable only by a quality difference. Defendant's Answer to Questions Raised by the Court at 8–9. This argument stands in contrast to defendant's earlier arguments which focused almost entirely on categorizing limited service OCTG as a "co-product." The court has been made aware of no distinction relevant to this case between the terms "co-product" and "joint product." Regardless of labels, this matter deals with two products of admittedly different value produced simultaneously from a single set of inputs.

ily permitted by the statute in all circumstances.

█ By declining to account for differences in value and treating prime and limited service products identically in its calculations of foreign market value, ITA made an unreasonable fair value comparison. Although some dispute exists as to the precise sales value of limited service OCTG relative to prime OCTG, it is not disputed that the value of limited service OCTG is generally lower, and for some grades of pipe greatly lower, than that of prime OCTG, and that this lower value is reflected in lower sales prices. *See* Ipsco Cost of Production Verification Exhibit No. C37 [at 335A]. It is now apparent that over half of the margin in this case is attributable to sales of limited service OCTG, at what may be fair, or fairer, low prices for the lower valued products. Defendant's Answers to Questions Raised by the Court at 7.[5]

█ The court finds that under the facts of this case, in order for ITA to comply with the statutory goal of arriving at a fair comparison, *see Smith–Corona Group v. United States,* 713 F.2d 1568, 1578 (Fed. Cir.1983) *cert. denied* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984), it must find a reasonable means of allocating the combined cost of production between these two very differently valued products in a manner which takes into account such differences in value,[6] *see Chemical Products Corp. v. United States,* 10 CIT 626, 636, 645 F.Supp. 289, 297 (1986), *remand order vacated,* 10 CIT 819, 651 F.Supp. 1449 (1986) (finding unreasonable and not in accordance with law ITA's failure to take into account the disparate values of two products yielded by the same production process when allocating factors of production between them), or ITA must adjust its overall methodology for calculating margins in some other way so as to account properly for the simultaneously produced second quality goods. Only when this is accomplished will the fair value comparison be sufficiently fair so as to satisfy the antidumping laws.[7]

---

5. Costing which involves allocation on the basis of significantly different values may cause the pre-averaged margins for prime OCTG to rise. The court is unaware as to what the final margins would be.

6. Both defendant and defendant-intervenor argue that if ITA assigns a cost to a product that is a function of the price charged for that product, foreign producers will be able to mask deliberate discriminatory pricing policies. They argue that the price charged for the product cannot be a factor in determining cost precisely because it is the producer's pricing policies which are subject to investigation in an antidumping case. If ITA does not believe the prices charged by Ipsco for the limited service and prime products accurately reflect their differing values, it is free to consider and use other measures of value including prices charged by the domestic industry for limited service and prime OCTG. In this case there seems to be substantial agreement that some significant differences in value do exist.

It should also be noted that a methodology which allocates actual costs of production according to some measure of value is entirely different from plaintiffs' suggested methodology which simply assigns a constructed value or cost of production to the limited service product which is equal to its value, and which, for the reasons discussed, *supra,* is contrary to the statute.

7. Defendant-intervenor also argues that the court cannot find ITA's determination to be unlawful based on ITA's failure to consider a costing methodology which was not suggested by Ipsco in the administrative proceeding below. That Ipsco did not argue for a particular methodology which the court finds acceptable is not dispositive of this matter. The issue before the court is whether ITA's methodology which assigns equal costs to products of significantly different values is reasonable. Plaintiffs have pursued this issue throughout the administrative proceeding. In a case where ITA's method has been shown to be contrary to law and where plaintiffs have diligently pursued the issue, they are not necessarily to be denied all relief because they did not also perceive that their proposed remedial approach was also unacceptable. The peculiar facts of each case will determine how far a party must go in pointing out ITA's errors and an acceptable cure. After all, ordinarily ITA has a variety of acceptable methodologies from which to choose. In this case, after expressing its tentative views as to both plaintiffs' and ITA's errors, the court gave defendant ample opportunity to demonstrate that an allocation methodology which properly accounts for the significant differences in value of the two product groups at issue is not feasible or is inappropriate. Furthermore, ITA has not argued that its choice of methodology stems from an application of the "best information available rule," that is, that ITA cannot verify

### C. ITA's use of constructed value

Plaintiffs make the additional argument, as they did before ITA, *see, e.g.,* Pub.Doc. 132 at 15 (Ipsco's Prehearing Brief), that if ITA were to apply the by-product methodology and treat the value figures derived therefrom (estimated market value or net realizable value) as the cost of production for limited service OCTG, it would find a significant number of home market sales of certain grades of that product to be above the cost of production and would not be forced to base foreign market value of all limited service OCTG on constructed value. *See* 19 U.S.C. § 1677b(a)(2) & (b) (1982). Plaintiffs aver that following this scenario ITA could compare sales prices of off-specification material in the United States with sales prices of certain off-specification material in the Canadian home market—the preferred actual price statutory comparison.[8]

■ As indicated above, the court finds contrary to law a methodology which simply equates cost of production or constructed value with estimated market value or net realizable value. Apart from having no basis in the statute it is difficult to envision any circumstances in which such an approach would lead to a finding of sales below the cost of production.[9] The court notes, however, that although plaintiffs' methodology is flawed, plaintiffs have preserved the issue of whether constructed value must be used for all grades of merchandise. Thus, ITA, on remand, should use home market sales, rather than constructed value, as a basis for foreign market value for some grades, if after recalculating cost of production it finds that plaintiffs have demonstrated a sufficient number of home market sales of the limited service product above the cost of production so as to permit calculations on an actual home market sales basis for such grades. 19 U.S.C. § 1677b(a).

### II. ITA'S TREATMENT OF EXPERIMENTAL PRODUCTS

In its previous opinion, the court rejected plaintiffs' arguments that certain sales of experimental merchandise must be excluded from U.S. price in order to make a fair comparison because ITA had acknowledged the experimental nature of these two products and made adjustments for the extraordinary costs associated with their production when it calculated foreign market value. The court stated that "[a]s the extraordinary nature of these products has already been factored into the foreign market value side of the equation, it would seem inconsistent to exclude sales of the same products from the United States price side of the equation." *Ipsco, Inc. v. United States,* 12 CIT ——, 687 F.Supp. 633, 641 (1988). The court did ask ITA to clarify whether it was applying a blanket rule under which "it *must* include all U.S. sales not made in the ordinary course of trade," or whether it was "merely making what would seem to be a reasonable determina-

---

8. Plaintiffs have never made clear to the court for which grades of limited service OCTG they believe there are a sufficient number of home market sales to allow for use of home market selling price in calculating foreign market value. Plaintiffs' counsel indicated at oral argument that the foreign market value of certain limited service products would, in any event, have to be based on constructed value.

information necessary to apply a more appropriate methodology. *See* 19 U.S.C. § 1677e (1982 & Supp. IV 1986).

In *Ipsco, Inc. v. United States,* 13 CIT ——, 710 F.Supp. 1581 (1989), the court upheld ITA's remand determination, in part, because no acceptable alternative methodology was suggested by plaintiffs. Examination of the record will reveal also that no acceptable alternative methodology was suggested by any of the parties or by the court during the course of litigation. In addition, although the court questioned ITA's overall valuation methodology, no party actually demonstrated that the basic methodology was contrary to law.

9. The court finds unpersuasive plaintiffs' argument that "cost of production" as used in this context is distinguishable in any way significant to this case from the cost of production utilized in calculating constructed value. *See* 19 U.S.C. § 1677b(e)(1)(A) (1982). The fact that the statute does not specifically define "cost of production" for the purpose of ITA's below cost of production investigation does not alter the plain fact that cost of production refers to costs, e.g., costs of materials and fabrication, which permit production of the subject merchandise.

tion to include the sales at issue here." *Id.* at 642.

On remand, ITA makes clear that it was not applying a blanket rule and that it is department policy to exclude certain U.S. sales from the LTFV comparison, namely (1) sales which are not representative of the seller's behavior and (2) sales which are so small that they would have an insignificant effect on the margin. The first factor is relevant to this case. ITA concludes that while the agency did have information that the pipe at issue was experimental and that sales of this particular pipe might not have been made in the future, it is not unusual for a company to sell experimental lines of merchandise and there is no reason to believe that other types of experimental pipe would not be marketed in the future. ITA states that it is not possible for it to conclude that these sales were not representative of Ipsco's sales practices in the U.S. market. Plaintiffs challenge this conclusion and ask the court to remand this issue and order ITA to provide significant reasons for distinguishing between sales which reflect a company's behavior in the U.S. market and those which do not reflect, or are not representative of that behavior.

Initially, it should be noted that on remand ITA has provided the clarification of its policy which was requested in the previous opinion. Furthermore, underlying plaintiffs' arguments is their apparent belief that inclusion of these sales has somehow skewed the fair value comparison in a manner unfavorable to themselves. As explained in the previous opinion, this argument fails.

It also seems that if the court were to accept plaintiffs' arguments here, it would in effect be placing a burden on ITA to determine in every case whether each U.S. sale relied on is representative of the respondents' behavior. Such a burden would be considerable, has no basis in the statute, and might invite respondents to find innovative ways of immunizing U.S. sales from the dumping laws by merely labeling them "experimental." A more prudent approach would dictate instead that ITA exercise its discretion in this area and exclude sales only in those limited situations in which ITA finds that inclusion of certain sales which are clearly atypical would undermine the fairness of the comparison of foreign and U.S. sales. *See Asociacion Columbiana de Exportadores de Flores v. United States,* 13 CIT ——, 704 F.Supp. 1114, 1126 (1989).

Plaintiffs also make much of the fact that ITA seems to admit these sales were not made "in the ordinary course of trade," Remand Determination at 8, and yet does not conclude that they were unrepresentative of the seller's behavior. Plaintiffs find this conclusion incongruous because they believe that a sale that is representative of a company's behavior in the U.S. market is "by definition" a sale made in the ordinary course of trade. If the court were to adopt plaintiffs' view equating "ordinary course of trade" with "representative of a seller's behavior" it, in effect, would be ordering ITA to exclude all sales from U.S. price which are made outside the ordinary course of trade. In its previous opinion, the court ruled that this is not required and in some cases would undermine the purpose of the antidumping laws.

## CONCLUSION

This matter is remanded. ITA shall issue a determination on remand within thirty days utilizing a methodology which eliminates the unfairness of failing to account for substantial differences in value of the two types of simultaneously produced products subject to investigation. Within ten days thereafter the parties shall advise the court whether post remand briefing is necessary, in which case a briefing schedule shall be proposed by plaintiff after consultation with opposing counsel. If ITA finds it necessary to reopen the investigation it shall so advise the court within 20 days hereof and shall, after consultation with the parties, propose a new schedule.

SO ORDERED.