**NMB SINGAPORE LTD., Pelmec Singapore Ltd. and NMB Corporation, Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**The Torrington Company and Federal–Mogul Corporation, Defendants–Intervenors.**

**Court No. 89–06–00342.**

United States Court of International Trade.

Nov. 26, 1991.

---

Tanaka, Ritger & Middleton, Michele N. Tanaka, Alice L. Mattice and Michael J. Brown, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (Jeanne E. Davidson); of counsel: John D. McInerney, Sr. Counsel, Douglas S. Cohen, Craig R. Giesse, Diane M. McDevitt, Stephanie J. Mitchell and Maria Solomon, Attorney–Advisors, Office of the Chief Counsel for Import Admin. Dept. of Commerce, Washington, D.C., for defendant.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and Lane S. Hurewitz, Washington, D.C., for The Torrington Co., defendant-intervenor.

Frederick L. Ikenson, Frederick L. Ikenson, J. Eric Nissley and Larry Hampel, Washington, D.C., for Federal–Mogul Corp., defendant-intervenor.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, NMB Singapore, Ltd., Pelmec Singapore, Ltd. and NMB Corporation (collectively, "NMB"), move pursuant to Rule 56.1 of the rules of this Court for partial judgment upon an agency record to contest the final determinations of the Department of Commerce, International Trade Administration ("Commerce" or "ITA") in *Final Determination of Sales at Less Than Fair Value: Ball Bearings and Parts Thereof From Singapore*, 54 Fed.Reg. 19,112 (1989). In particular, plaintiffs contend that the ITA erred in including ball bearing parts in its calculation of the viability of the Singapore home market for NMB's ball bearings. Plaintiffs also assert that the ITA improperly included related party transfers of parts in the viability calculations when there were no comparable sales of parts to unrelated parties.

### Background

Defendant-intervenor The Torrington Company ("Torrington") filed a petition on March 31, 1988 requesting that the ITA impose antidumping duties on all imports of antifriction bearings and parts thereof, except for tapered roller bearings, from a number of countries, including Singapore. General Administrative Record ("GAR") (Public) Doc. 1. In the course of the ensuing investigation, the ITA determined that NMB's home market for ball bearings in Singapore was not an appropriate market to compare to the United States market for purposes of calculating the dumping margin. Thus, the ITA resorted to using NMB's sales in a third country, Japan, to determine the margin. On May 15, 1989, the ITA published an antidumping duty order for ball bearings and parts thereof from Singapore, setting an estimated weighted average margin of 25.08% on NMB's merchandise. 54 Fed.Reg. at 20,907.

*Discussion*

■ A final antidumping determination by the Department of Commerce will be affirmed unless that determination is not supported by substantial evidence or is otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States*, 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988).

I. Inclusion of Parts in Viability Calculations

In the course of an antidumping investigation, Commerce must determine if the imported merchandise in question was sold in the United States during the period of investigation at less than fair value. 19 U.S.C. § 1673d(a)(1) (1988). In doing this, the ITA compares the United States price of the goods to their foreign market value ("FMV"), and the amount by which FMV exceeds the U.S. price is the dumping margin. 19 U.S.C. § 1673e(a)(1) (1988). Determining FMV requires that the ITA choose which foreign market sales to use for comparison pursuant to a statutory and regulatory hierarchy. *U.H.F.C. Co. v. United States*, 916 F.2d 689, 692 (Fed.Cir.1990).

Ideally, FMV is the price "at which such or similar merchandise is sold ... in the principal markets of the country from which exported," that is, the home market of the firm. 19 U.S.C. § 1677b(a)(1)(A) (1988). However, if the ITA determines that the merchandise is not sold in the home market, or if

> the quantity sold for home consumption is so small in relation to the quantity sold for exportation to countries other than the United States as to form an inadequate basis for comparison, then the price at which [such or similar merchandise is] so sold or offered for sale for exportation to countries other than the United States,

shall be the foreign market value. 19 U.S.C. § 1677b(a)(1)(B) (1988). In certain cases, even such "third country sales" may be an inappropriate basis for determining FMV, in which case the ITA may use "constructed value." 19 U.S.C. § 1677b(a)(2) (1988); 19 C.F.R. § 353.4(a) (1990); [1] *see Kerr–McGee Chemical Corp. v. United States*, 14 CIT ——, ——, 741 F.Supp. 947, 950 (1990).

Home market sales generally are considered too small if they constitute less than five percent of the quantity sold in countries other than the United States. 19 C.F.R. § 353.4 (1988). In that case, since the home market is not "viable," FMV must be calculated by alternative means, that is, by using either third country sales or constructed value. 19 U.S.C. § 1677b(a).

■ Plaintiffs' complaint is that the ITA wrongly included parts of bearings in its calculation of the viability of NMB's home market for ball bearings; that is, the ITA considered ball bearing parts to be merchandise which is "such or similar" to finished ball bearings, and that this caused NMB's home market sales to fall below the regulatory benchmark of 5% of its non-U.S. sales.

The government's response is that it tested viability based on the five classes or kinds of bearings under investigation (ball bearings, spherical roller bearings, cylindrical roller bearings, needle roller bearings and spherical plain bearings) rather than on the such or similar merchandise categories normally compared. The reason was that the variations in characteristics of the such or similar merchandise selected by Commerce would have made it "necessary to conduct several hundred viability tests." *Memorandum of the United States In Opposition to Plaintiffs' Motions for Partial Judgment Upon the Agency Record Regarding Certain Fundamental Issues* ("Defendant's Memorandum") at 135. Consequently, all sales of antifriction bearings fitting within one of the five classes of bearings, as well as all sales of parts of those bearings, were compared together. Thus, sales of ball bearings and parts of

---

**1.** A similar regulation is now found at 19 C.F.R. § 353.48(a) (1991).

ball bearings in Singapore were divided by sales of ball bearings and parts of ball bearings in all non-U.S. markets, and the resulting percentage was less than 5%.

NMB claims this was unfair and improper because almost all of its sales of ball bearing parts were to its Thai sister company, NMB/Pelmec Thailand, and NMB did not sell parts in the home market. Since each part was treated as if it was equal to each finished bearing, dividing home market sales by non-U.S. sales yielded a figure of less than 5%. The government asserts that it tested parts with finished bearings under each of the five classes of bearings because it would have been wrong to recognize the distinction between finished bearings and parts, and not recognize the hundreds of permutations among bearings based on other characteristics such as outside diameter. *Defendant's Memorandum* at 158; *see* 54 Fed.Reg. at 19,021.

In *SKF USA, Inc. v. United States*, 15 CIT ——, 762 F.Supp. 344 (1991), a related case, this Court affirmed the decision to test viability based on the five classes or kinds, but remanded the case on the issue of testing both finished bearings and parts together. *SKF*, 15 CIT at ——, 762 F.Supp. at 351–52. The Court concurs that, given the large number of variations in merchandise and the unique complexity of the bearings investigations, testing viability based on the five classes was appropriate. However, within each class or kind, the ITA should have tested parts separately from finished bearings, where there was no uniform indication of how many parts comprise a bearing, and where the sale of each part was treated the same as the sale of each bearing. *See* GAR (Pub.) Docs. 283 at 2, 327 at 5–6. The distinction between a finished product and its component parts is fundamental and it would not have sabotaged the class distinctions favored by Commerce for the ITA to have tested parts and finished bearings separately.[2]

■ Commerce is afforded great latitude in the choice of methodology to be employed in antidumping investigations. *Mit-*

*subishi Elec. Corp. v. United States*, 12 CIT 1025, 1050, 700 F.Supp. 538, 558 (1988), *aff'd*, 898 F.2d 1577 (Fed.Cir.1990). However, the methodology must be a "reasonable means of effectuating the statutory purpose" and the guiding objective of the law must not be contravened. *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404–05, 636 F.Supp. 961, 965–66 (1986), *aff'd*, 810 F.2d 1137 (Fed.Cir.1987).

While the "complex facts" of this case permit Commerce to test viability based on the five classes of bearings, they do not justify the decision not to test parts separately from finished bearings. The result would have been just five more viability tests, not "several hundred," and a more accurate determination of the status of the home market would have ensued. Given the lack of data as to how many parts comprise an average bearing, and the consequent equation of one part to one bearing, the decision to treat parts and completed bearings as such or similar merchandise was not reasonable and was not in accordance with either the letter or the spirit of 19 U.S.C. § 1677b(a)(1)(A).

■ However, during the investigations, Commerce did in fact respond to the complaints of the few importers whose home markets of finished bearings and parts thereof were found to be non-viable, by testing the viability of finished bearings alone. NMB was such an importer, and the results of the re-testing were that NMB's home market sales of *finished* ball bearings constituted more than 5% of its total non-U.S. sales of finished ball bearings. Singapore Administrative Record ("SAR") (Confidential) Doc. 12 (Attachment 25); 54 Fed.Reg. at 19,022.

Nonetheless, the ITA decided to disregard these results and use NMB's third country data in the price comparisons. The first reason given was that NMB's "submissions on value and volume of sales data were inconsistent with respect to which parts were reported and on what basis (*i.e.,* date of shipment vs. date of purchase or-

---

**2.** For example, while a finished ball bearing with a six inch outside diameter may be similar

to one with a four inch diameter, a ball or cage is not similar to a finished bearing of any size.

der) they were reported." 54 Fed.Reg. at 19,022. Second, the ITA stated that the increase in the home market's percentage of total non-U.S. sales was not significant, even though the percentage went from under the 5% benchmark to over it. *Id.;* SAR (Conf.) Doc. 12 (Attachment 25). The ITA explained that, because of these reasons, it could not be confident of the viability of the home market and thus third country data from Japan was used instead. Defendant's Memorandum at 140.

The Tariff Act of 1930, as amended, states a statutory preference that home market sales be used, unless they are too small for comparison. 19 U.S.C. § 1677b(a)(1). Commerce's own regulations require that it pursue other markets for comparison only when the home market accounts for less than 5% of its total non-U.S. sales. 19 C.F.R. § 353.4 (1988). The ITA is obliged to follow its regulations unless it provides a compelling reason for departure. *See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Airmark Corp. v. F.A.A.,* 758 F.2d 685, 692 (D.C.Cir.1985); *Western Conference of Teamsters v. Brock,* 13 CIT ——, ——, 709 F.Supp. 1159, 1169 (1989); *ILWU Local 142 v. Donovan,* 9 CIT 620, 625, 1985 WL 6154 (1985), *reh'g denied,* 10 CIT 161, 1986 WL 30016 (1986). The fact that the increase in the home market's share of total sales was only slight is not a compelling reason, where the percentage did surpass the regulatory benchmark.

The other reason, that the home market data was ambiguous and inconsistent, is a more potent argument. However, the *Final Determination* indicates that the "inconsistent" reporting was only with regard to the sales of parts. 54 Fed.Reg. at 19,-

022.[3] Once parts are removed from the equation, this inconsistency will dissipate. Therefore, this reason is inapplicable to the viability of the home market for finished ball bearings. There being no other stated reason why the home market for finished ball bearings was not used for price comparisons, the Court finds that Commerce's decision not to use the home market for comparison was not in accordance with law.

Accordingly, the Court remands this case to the ITA with instructions that it use NMB's home market sales data for finished ball bearings from Singapore in the price comparisons for purposes of the less than fair value determination. The ITA shall also determine the viability of NMB's home market for ball bearing parts in a separate calculation. The ITA shall make any further adjustments to the final determination as these changes may require.

## II. Related Party Transfers

█ NMB also asserts that the ITA improperly used related party transfers in the viability calculations. Commerce's regulations state that

> If such or similar merchandise is sold ... in the home market or, as appropriate, to third countries, to a person related to the seller of the merchandise in any of the respects described in section 771(13) of the Act, *the price at which such or similar merchandise is sold ... to such person ordinarily will not be used in the determination of foreign market value* unless such sales are demonstrated to the satisfaction of the Secretary to be at prices comparable to those at which such or similar merchandise is sold to persons unrelated to the seller.

---

**3.** The *Final Determination* states that NMB's "submissions on value and volume of sales data were inconsistent with respect to which *parts* were reported and on what basis (*i.e.,* date of shipment vs. date of purchase order) they were reported." 54 Fed.Reg. at 19,022 (emphasis added).

The inconsistency in the sales data for parts is due to NMB's initial reporting of that data based on shipment dates, and then its later reporting

based on purchase order dates. 54 Fed.Reg. at 19,024. The government claims that this inconsistency "made it unclear which sales actually were being reported as being within the period of investigation and, therefore, which quantities should be included in the viability calculations." *Defendant's Memorandum* at 161. Hence, the government concludes that these ambiguities made that home market data unreliable.

19 C.F.R. § 353.22(b) (1988) (emphasis added).[4]

All of plaintiffs' sales of parts were to a related party. *See* SAR (Conf.) Doc. 12 (Attachment 25). Thus, plaintiffs assert that these sales should be disregarded since there were no sales to unrelated parties which could serve to determine if the related party transfers were at arms length.

The Tariff Act makes no mention of related party transfers in the context of the viability analysis and the regulation cited above does not call for exclusion of such transfers from the viability calculations. Related party transfers *must* be excluded only from actual price comparisons, not from the home market viability tests. This is because the viability test seeks only to determine the level of market activity in a given country, not whether that activity was at arms length. The arms length determination is relevant only to the LTFV comparisons. Hence, the ITA's decision to include related party transfers in the viability computations was in accordance with law and is affirmed.

### Conclusion

The Court holds that the determination by the ITA to test the viability of plaintiffs' home market for ball bearings and parts of ball bearings together was not in accordance with law and is remanded. The Court finds that Commerce's decision to depart from its regulation requiring use of the home market in LTFV calculations where the home market's percentage of total non-U.S. sales is equal to or greater than 5% was not in accordance with law. Accordingly, the ITA is instructed to use home market sales in the price comparisons for finished ball bearings, and to make any further adjustments to its final determinations and antidumping duty order as that change requires.

Additionally, the ITA is instructed to test the viability of the home market for ball bearing parts separately from that for finished ball bearings, and to make any further changes to its determinations as necessary.

The Court further finds that the ITA's use of related party transfers in the calculations of home market viability was in accordance with law and is affirmed.

---

**4.** A similar provision is now found at 19 C.F.R. § 353.45 (1991).