**CHANG TIEH INDUSTRY CO., LTD.,**
**Plaintiff and Defendant–**
**Intervenor,**

Avesta Sheffield, Inc., Bristol Metals, Inc., Damascus Tube Division, Damascus–Bishop Tube Co., Trent Tube Division of Crucible Materials Corporation, and the United Steelworkers of America (AFL–CIO/CLC), Plaintiffs and Defendant–Intervenors,

v.

**The UNITED STATES, Defendant.**

Court No. 93–01–00053.

United States Court of International Trade.

Dec. 9, 1993.

Grunfeld, Desiderio, Lebowitz & Silverman, David L. Simon and Jeffrey S. Grimson, Washington, DC, for plaintiff and defendant-intervenor Chang Tieh Industry Co., Ltd.

Collier, Shannon, Rill & Scott, David A. Hartquist, Jeffrey S. Beckington and Kathleen W. Cannon, Washington, DC, for plaintiffs and defendant-intervenors Avesta Sheffield, Inc., et al.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Cynthia B. Schultz, Marguerite E. Trossevin, Atty. Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel, Washington, DC, for defendant.

## OPINION

RESTANI, Judge: ·

In this case, the domestic industry and a foreign manufacturer both challenge an antidumping duty determination by the United States Department of Commerce, International Trade Administration ("ITA"). ITA's determination excluded the foreign manufacturer Chang Tieh Industry Co., Ltd. ("Chang Tieh") from an antidumping order on certain conditions. *Certain Welded Stainless Steel Pipes from Taiwan,* 57 Fed.Reg. 53,705, 53,-709 (Dep't Comm.1992) (final determ. of sales at less than fair value) (requiring Chang Tieh's consent to conditions) (*"Final Results "*); *Certain Welded Stainless Steel Pipe from Taiwan,* 57 Fed.Reg. 62,300, 62,301 (Dep't Comm.1992) (amended final determ. & antidumping duty order) (excluding Chang Tieh after having received its consent to conditions) (*"Amended Final Results"*). Among these conditions was Chang Tieh's acquiescence to the immediate application of the antidumping order if ITA subsequently found that Chang Tieh "has sold or is likely to sell subject merchandise to the United States at less than its foreign market value." *Id.*

Chang Tieh moves for judgment on the agency record on the ground that the conditional exclusion was an inappropriate exercise of ITA's power. Avesta Sheffield, Inc. ("Avesta"), representing the domestic industry, argues that the court has no jurisdiction over Chang Tieh's challenge of the agency determination. Avesta also moves for judgment on the agency record, contending that data concerning Chang Tieh's sales do not support its exclusion from the antidumping order.

 In resolving Avesta's motion, the court will address the following issues: 1) whether Chang Tieh's sales data were unrepresentative or not *bona fide* and should have been disregarded, 2) whether ITA should have determined that the foreign market value ("FMV") was duty-inclusive before granting a duty drawback, 3) whether ITA should have adjusted either U.S. price or FMV to account for value-added taxes ("VAT"), and 4) whether ITA properly allocated Chang Tieh's labor and overhead costs. ITA's determination will be sustained if it is supported by substantial evidence on the record and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988).

## BACKGROUND

On November 18, 1991, Avesta and other representatives of the domestic steel pipe industry ("petitioners") filed with ITA petitions alleging dumping by Chang Tieh and other foreign manufacturers. *Certain Welded Stainless Steel Pipes from the Republic of Korea and Taiwan,* 56 Fed.Reg. 65,043, 65,-043 (Dep't Comm.1991) (init. of antidumping duty investigations). Based on petitioners' submissions, ITA initiated an antidumping duty investigation on December 13, 1991. *Id.* at 65,044.

The United States International Trade Commission ("ITC") reached an affirmative preliminary determination of injury in January 1992. *Certain Welded Stainless Steel*

*Pipes from the Republic of Korea and Taiwan,* USITC Pub. 2474, Inv. Nos. 731–TA–540 and 541 (Jan. 1992) (prelim. determ.). ITC found a reasonable indication that the domestic industry was materially injured due to imports of Korean and Taiwanese stainless steel pipe, which were allegedly sold at less than fair value ("LTFV"). *Id.* at 1. ITA subsequently issued an affirmative preliminary determination of LTFV sales, calculating Chang Tieh's dumping margin to be zero. *Certain Welded Stainless Steel Pipes from Taiwan,* 57 Fed.Reg. 27,735, 27,738 (Dep't Comm.1992) (prelim. determ. of LTFV sales & postponement of final determ.).

On July 1, 1992, petitioners informed ITA of their suspicion that Chang Tieh had sold its merchandise in intentionally small volumes and at artificially inflated prices inconsistent with commercial reality for the purpose of avoiding antidumping duty liability. *See Final Results,* at 53,706. Petitioners' preverification comments, submitted on July 2, alleged collusion between Chang Tieh and its U.S. importer and compared Chang Tieh's prices to those of other importers in an attempt to show that Chang Tieh had priced its goods above market value. Appendix to Memorandum of Points and Authorities in Support of Motion by Plaintiffs Avesta Sheffield, Inc., et al., for Judgment Upon the Agency Record ("Avesta's Appendix"), Doc. 6, at 2–4. Approximately two weeks later, ITA received a confidential two-page affidavit repeating petitioners' allegations with regard to collusion. *Id.,* Doc. 7, Attachment 1. ITA granted anonymity to petitioners' sources of information on September 2, 1992. *Final Results,* at 53,706.

Petitioners filed additional affidavits on September 10 and 21 without providing redacted versions. *Id.* Officials at ITA spoke with the affiants on September 22 in order to confirm their identities and their knowledge of information contained in the affidavits. Avesta's Appendix, Doc. 5, at 1. On September 23, petitioners prepared redacted versions of the affidavits, but refused to serve them on other interested parties. *Final Re-*

*sults,* at 53,706. ITA made several subsequent requests for public versions that could be released pursuant to the administrative protective order. *Id.* Public versions were finally submitted on November 3. *Id.*

Despite the delay in issuing public versions of the additional affidavits, Chang Tieh received notice of petitioners' concerns and a copy of the first affidavit detailing their allegations in July 1992. Avesta's Appendix, Doc. 3, at 4 (certificate of service on Chang Tieh); *id.,* Doc. 7, Attachment 1, at 3 (certificate of service on Chang Tieh). In late September and early October, ITA sent inquiries to Chang Tieh and its U.S. importer, who both provided ITA with arguments and data to rebut the allegations. *Final Results,* at 53,706; Avesta's Appendix, Docs. 17 & 19.

On November 12, ITA issued a final affirmative determination of LTFV sales, finding a zero dumping margin for Chang Tieh.[1] *Final Results,* at 53,722. ITA adjusted Chang Tieh's U.S. price upward for duty drawback on raw materials imported into Taiwan and then converted into steel pipe for export. *Id.* at 53,709–10. Rather than tracing the raw materials from import to export as finished goods, ITA confirmed that the manufacturer had imported sufficient raw materials to make the quantity of goods eventually exported to the United States. *Id.* at 53,710. ITA adjusted U.S. price for VAT without performing an econometric analysis to determine whether the tax had been passed through to the consumer. *Id.* ITA also made a circumstance of sale adjustment to foreign market value based on VAT issues. *Id.*

Because of its concerns regarding Chang Tieh's possible creation of an artificially high U.S. price, ITA directed Chang Tieh to provide a certification "similar to those required under [19 C.F.R.] §§ 353.14 and 353.25(b)" before excluding Chang Tieh from the dumping order. *Id.* at 53,709. The "similar" certification constituted an affirmation by Chang Tieh that it had not dumped goods in the past and would not dump goods in the fu-

---

1. ITA did not use a "best information available" ("BIA") margin as requested by Avesta. The margin determination was based on verified sales data from Chang Tieh, although ITA did resort to partial BIA in the calculation of ocean freight charges. *Final Results,* at 53,712.

ture.[2] *Id.* The dissimilar condition contained in the certification, and the condition that led to Chang Tieh's challenge to the determination at issue, was the requirement of Chang Tieh's consent to the immediate application of the antidumping order "if the Department determines at any time during the existence of the antidumping order that [Chang Tieh] has sold or is likely to sell the subject merchandise to the United States at less than its foreign market value." *Id.* Chang Tieh submitted the certification under protest, reserving all legal rights. Avesta's Appendix, Doc. 24, Attachment B, at 1. ITA issued an antidumping order excluding Chang Tieh on December 30, 1992. *Amended Final Results,* at 62,301.

## DISCUSSION

I. Avesta's Motion for Judgment on the Agency Record

### A. Exclusion of Unrepresentative Sales from U.S. Price Data Pool

■ Avesta argues that the questionable nature of Chang Tieh's U.S. sales data *should have caused ITA to ignore the data as being unrepresentative and to apply BIA to determine a dumping margin. See* 19 U.S.C. § 1677e(b), (c) (1988) (mandating use of BIA if data cannot be verified or are not produced in a timely manner and in the form required). Chang Tieh responds that its U.S. sales were typical of its normal business practices and that ITA had no discretion to discard the entire sales base on the ground of unrepresentativeness.

■ The antidumping statute directs ITA to calculate *foreign market value* on the basis of sales made "in the ordinary course of trade for home consumption." *Id.* § 1677b(a)(1)(A) (1988). Sales intended to establish a fictitious market are excluded from the computation of foreign market value. *Id.* § 1677b(a)(1). The statutory and regulatory definitions of U.S. price do not contain similar limitations. *See id.* § 1677a (1988); 19 C.F.R. § 353.41 (1992). This court has reasoned,

if Congress intended to require [ITA] to exclude all sales made outside the "ordinary course of trade" from its determination of United States price it could have provided for such an exclusion in the definition of United States price, as it has in the definition of foreign market value. It has not done so.

*Ipsco, Inc. v. United States,* 12 CIT 384, 394, 687 F.Supp. 633, 641 (1988) ("*Ipsco I*"). ITA is thus not required to disregard automatically all sales made out of the ordinary course of trade in determining U.S. price. *Id.* at 395, 687 F.Supp. at 641.

ITA instead has the discretion to disregard certain U.S. pricing data if "inclusion of certain sales which are clearly atypical would undermine the fairness of the comparison of foreign and U.S. sales." *Ipsco, Inc. v. United States,* 13 CIT 402, 408, 714 F.Supp. 1211, 1217 (1989) ("*Ipsco II*"), *rev'd on other grounds,* 965 F.2d 1056 (Fed.Cir.1992). In *Ipsco II,* the court affirmed ITA's practice of excluding "(1) sales which are not representative of the seller's behavior and (2) sales which are so small that they would have an insignificant effect on the margin." *Id.,* 714 F.Supp. at 1217.

In accordance with this practice, ITA has excluded seven sales of damaged or defective merchandise from a fair value comparison. *Circular Welded Non–Alloy Steel Pipe from the Republic of Korea,* 57 Fed.Reg. 42,942, 42,949 (Dep't Comm.1992) (final determ. of LTFV sales). It has also disregarded transactions in which the U.S. customer withheld payment, where the sales comprised less than one percent of the respondent's U.S. trade. *Fabric and Expanded Neoprene Laminate from Taiwan,* 52 Fed.Reg. 37,193, 37,194 (Dep't Comm.1987) (final determ. of LTFV sales). In contrast, sales of experimental goods have been included in U.S. price because "it is not unusual for a company to sell experimental lines of merchandise." *Ipsco II,* 13 CIT at 408, 714 F.Supp. at 1217.

Avesta argues that Chang Tieh's sales are unrepresentative because other producers of

2. Chang Tieh made the same representations in open court and this aspect of the certification is

not the essential point of dispute.

steel pipe, allegedly a fungible commodity, priced their merchandise much lower than Chang Tieh did. Avesta also relies on the small volume of goods exported to the United States by Chang Tieh. The court finds it unusual, if not improper, to refer to the entire corpus of a party's U.S. sales as "unrepresentative," as they are obviously representative of that seller's behavior. Rather, the question seems to be whether the sales are the result of a *bona fide* arm's length transaction. *See PQ Corp. v. United States*, 11 CIT 53, 57–58, 652 F.Supp. 724, 729 (1987) (even a single sale may establish U.S. price if it is the result of a *bona fide* arm's length transaction).

Apparently ITA recognizes it has authority to prevent fraud upon its proceedings. In at least one case ITA discarded a respondent's entire U.S. sales base and applied BIA where documents discovered at verification indicated that information might have been fabricated for the purpose of the investigation. *Sulfanilic Acid from the Republic of Hungary*, 58 Fed.Reg. 8256, 8257 (Dep't Comm.1993) (final determ. of LTFV sales). Thus, if evidence demonstrated to ITA that Chang Tieh orchestrated an export scheme involving artificially set prices for purposes of dumping after the investigative period, one would expect ITA to disregard the sales as not resulting from a *bona fide* transaction.

In *PQ*, where ITA found the single U.S. sale *bona fide*, the price of the single sale was lower than a price set by the one known U.S. supplier. 11 CIT at 58, 652 F.Supp. at 729. In this case ITA made no specific finding as to whether the sale was at a higher or lower level than fairly traded sales. There was no evidence that the price charged by Chang Tieh was outside an appropriate market range, disregarding obviously dumped prices. The record does reveal, however, that prices for this merchandise did fluctuate. *Certain Welded Stainless Steel Pipes*, USITC Pub. 2474, at A–47, A–49. There was

also some evidence of limited market channels for the exporters at issue. *Id.* at A–40. Obviously, ITA found circumstantial evidence based on price insufficient to conclude a non-*bona fide* transaction existed or that the sales were otherwise unusable.

ITA also accepted and examined Avesta's affidavits alleging fraud. ITA found that affidavits by officials in the domestic industry "raise[d] significant concerns about potential evasions ... of the antidumping order." *Final Results*, at 53,709. The affidavits, however, are vague and inconclusive. They contain the bare allegation of a conversation between an unidentified representative of Chang Tieh's U.S. customer and an industry official, in which the representative is purported to have admitted to importing a small volume of merchandise at inflated prices in order to elude the imposition of duties. *See* Avesta's Appendix, Doc. 7, Attachment 1; *id.*, Doc. 8, Attachments 1 & 2. No hard data substantiating this allegation appears in the administrative record, and it was made clear at oral argument that the representative of Chang Tieh's U.S. customer, who allegedly admitted wrongdoing, was never identified. Apparently ITA found the hearsay evidence insufficiently reliable to support the charges. As stated by ITA, "petitioner's allegation does not constitute sufficient grounds to reject all of [Chang Tieh's] U.S. sales data and resort to BIA." *Final Results*, at 53,711. A review of both the pricing data and the affidavits reveals that ITA did not act unreasonably, nor did it disregard significant evidence in reaching its conclusion in this regard. ITA weighed conflicting evidence and reached a conclusion based on substantial evidence as to U.S. price.

### B. Duty Drawback Adjustment

█ Avesta argues that ITA misinterpreted the statute by adjusting U.S. price for duty drawback without ensuring that the foreign market value was duty-inclusive.[3] This

---

**3.** Section 772(d)(1)(B) of the Tariff Act of 1930, as amended, provides for an upward adjustment to United States price, often referred to as a "duty drawback" adjustment, as follows:

(d) [t]he purchase price and the exporter's sales price shall be adjusted by being—
(1) increased by—

. . . .

(B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States.

court in *Avesta Sheffield, Inc. v. United States*, Slip Op. 93–217, 1993 WL 488446 (Nov. 18, 1993), sustained ITA's duty drawback adjustment despite the exact same argument being raised. *Id.* at 9. The court upheld ITA's use of its two-prong test to determine entitlement to a drawback adjustment: 1) "that the import duty and rebate are directly linked to, and dependent upon, one another" and 2) "that the company claiming the adjustment can demonstrate that there were sufficient imports of imported raw material to account for the duty drawback received on the exports of the manufactured product." *Id.* at 6–7.

ITA applied the same test in the case at bar. *Final Results*, at 53,709. In this case, there is no dispute that the first prong of the test has been met. *Id.* In previous reviews of ITA determinations involving steel coil and the Taiwanese system of drawbacks, this court has concluded that Taiwan does require a producer to demonstrate that a certain linkage exists between duties paid on import and rebated upon export.[4] *Far East Mach. Co. v. United States*, 12 CIT 972, 975–76, 699 F.Supp. 309, 312–13 (1988). Thus, rebates are made only upon proof that duties were paid on imported raw materials. The ITA confirmed that the Taiwanese system operated in this manner in the case at hand. *Final Results*, at 53,709.

■ It is clear that in the second prong "there is no requirement that specific input be traced from importation through exportation before allowing drawback on duties paid." *Avesta Sheffield, Inc.*, Slip Op. 93–217, at 8, 1993 WL 488446 (quoting *Far East Mach.*, 12 CIT at 975, 699 F.Supp. at 312). ITA's review of Chang Tieh's import permits indicated that sufficient imports of steel coils existed for the claimed exported amounts of finished pipes. *Final Results*, at 53,710. Therefore, Chang Tieh has satisfied both prongs of the test for drawback adjustment.

Avesta's arguments provide no basis from which to conclude that drawback adjustments

should not be made unless ITA determines that the cost of the products sold in the home market is duty-inclusive. To require such a finding would add a new hurdle to the drawback test that is not required by the statute. Assuming *arguendo* that the statute would permit ITA to add a new test, there is nothing about this case which suggests that under these facts ITA abused any discretion it had, by not adding the test. ITA's duty drawback adjustment to U.S. price is sustained.

### C. Value–Added Tax Adjustment

■ Avesta contends that ITA erred in adjusting U.S. price upward for value-added taxes ("VAT") forgiven upon exportation without conducting an analysis of whether the tax was passed through to the home market customer. *See* 19 U.S.C. § 1667a(d)(1)(C). It further objects to ITA's circumstance of sale adjustment to foreign market value based on VAT. *See* 19 U.S.C. § 1677b(a)(4)(B).

Both issues have been resolved by recent Federal Circuit opinions. In *Daewoo Elecs. Co. v. United States*, 6 F.3d 1511 (Fed.Cir. 1993), the Federal Circuit unequivocally determined that ITA need not conduct a pass-through analysis in order to adjust U.S. price to account for VAT. *Id.* at 12–13. Thus, no remand for adjustment to U.S. price is needed. *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573 (Fed.Cir.1993), concluded that a circumstance of sale adjustment based on VAT was an incorrect application of the statute. *Id.* at 1581. The parties agree, however, that a remand on this issue is unnecessary unless a non-zero margin is a possibility as a result of Avesta's other challenges.

### D. Allocation of Costs

■ Avesta alleges two principal errors in ITA's allocation of Chang Tieh's labor and overhead costs. First, it objects to ITA's calculation of per ton costs as a ratio between costs incurred exclusively for subject merchandise and tonnage of all manufactured

19 U.S.C. § 1677a(d)(1)(B); *see* 19 C.F.R. § 353.-41(d)(1)(ii).

**4.** This conclusion is also consistent with other decisions that analyzed the Taiwanese rebate sys-

tem in the context of trade of other products. *See, e.g., Bicycles from Taiwan*, 48 Fed.Reg. 31,-688, 31,690 (Dep't Comm.1983) (final determ. of LTFV sales).

products. Chang Tieh asserts that it excluded only one element of overhead costs—depreciation of a piece of equipment not used to produce steel pipe, the subject merchandise. According to Chang Tieh, no other costs were incurred exclusively for pipe and therefore it was proper to divide the overhead costs for pipe production by the tonnage of all goods manufactured by Chang Tieh. ITA "did not note any inconsistencies" in this methodology. *Final Results,* at 53,-713. Neither does the court.

Avesta also faults ITA with basing verification on untrustworthy documents not demonstrative of Chang Tieh's normal cost accounting methodology. Chang Tieh responds that its cost accounting system mirrors its financial accounting system, which ITA examined at verification. It asserts that ITA relied not only on the documents Chang Tieh appended to its questionnaire, but also on verification of the audited financial records. ITA's determination states, "[t]he labor and overhead costs reported by [Chang Tieh] were reviewed at verification and determined to be consistent with [Chang Tieh's] normal cost accounting methodology." *Id.* Avesta has not demonstrated that this finding is unsupported by substantial evidence on the record or is otherwise not in accordance with law. ITA did not err in allocating Chang Tieh's labor and overhead costs.

## II. Chang Tieh's Motion for Judgment on the Agency Record

As a preliminary matter, this court finds that it has jurisdiction over Chang Tieh's challenge of the administrative determination. It is axiomatic that a prevailing party may not appeal a decision favorable to him. *Freeport Minerals Co. v. United States,* 758 F.2d 629, 634 (Fed.Cir.1985). The conditional exclusion of Chang Tieh from the antidumping order was not a true exclu-

sion and thus was not favorable to Chang Tieh. Furthermore the issue is ripe and need not await an attempt by ITA to enforce the condition at issue.

The issue before the court on Chang Tieh's motion is the propriety of ITA's demand for a signed certification as a prerequisite to exclusion of Chang Tieh from the antidumping order. The certification states in relevant part,

if [ITA] has reasonable cause to believe or suspect at any time during the existence of the antidumping order ... [that] Chang Tieh has sold or is likely to sell the subject merchandise to the United States at less than its foreign market value, then [ITA] may institute an administrative review of Chang Tieh under section 751 of the Tariff Act of 1930, as amended.

Avesta's Appendix, Doc. 24, Attachment A.[5]

The statutory section concerning final administrative determinations of LTFV sales does not address the question of whether ITA may condition its exclusion determination upon consent to review by investigated parties. *See* 19 U.S.C. § 1673(a) (1988). The regulations, however, provide that ITA *"will"* publish an antidumping duty order that "[e]xcludes ... any producer or reseller for which [ITA] finds that there was no weighted-average dumping margin." 19 C.F.R. § 353.21(c) (1992) (emphasis added).[6] Whenever a company is investigated and receives a zero margin, it should thus be excluded from the antidumping order pursuant to 19 C.F.R. § 353.21(c). ITA cites to no case in which a party found to have a zero margin was not excluded.

This court has approved so-called end use certification procedures without explicit support in the regulations, but these procedures bear little or no resemblance to the certification required by ITA in the challenged determination. Further, they do not appear to

---

**5.** As indicated, the certification also contains Chang Tieh's promise that it did not engage in past dumping practices and would not do so in the future. *Id.*

**6.** A separate regulation provides that a request for exclusion will be considered only if accompanied by a certification that the company did not

dump goods in the past and would not dump goods in the future. 19 C.F.R. § 353.14 (1992). Chang Tieh did not specifically request exclusion. Rather, it was a respondent found to have a zero rate. The regulations require a similar certification from parties requesting a revocation or termination. 19 C.F.R. § 353.25(b)(1) (1992).

conflict with any regulations. *See Ipsco, Inc. v. United States,* 13 CIT 489, 494, 715 F.Supp. 1104, 1109 (1989) ("*Ipsco III* "). In *Ipsco III,* ITA's scope ruling excluded goods certified by the end user as not employed in drilling for oil and gas. 13 CIT at 490 & n. 1, 715 F.Supp. at 1106 & n. 1. The court found the end use certification procedure to be "a reasonable extension of ITA's authority to clarify the scope of antidumping and counter-vailing duty orders." *Id.* at 494, 715 F.Supp. at 1109 (citing *Mitsubishi Elec. Corp. v. United States,* 12 CIT 1025, 1051, 700 F.Supp. 538, 559 (1988) (upholding ITA's lim-itation of investigation's scope to subassem-blies "dedicated exclusively for use" in cellu-lar mobile telephones), *aff'd,* 898 F.2d 1577 (Fed.Cir.1990)). The certification required from Chang Tieh, in contrast, was not re-quested in the context of a scope determina-tion and seems to deny Chang Tieh the auto-matic right to exclusion granted by 19 C.F.R. § 353.21(c) to those with zero margins.

■ Once ITA decided, based on the rec-ord, that there was no substantial evidence of fraudulent behavior, it was bound to accept its own zero margin finding and act accord-ingly. ITA essentially admits that the regu-lation is applicable by its terms and that those terms leave no room for the certifica-tion procedure. Nonetheless, it states that on a "case by case" basis ITA may abandon its regulations for good reason. None of the cases cited support such a notion. One case, *NMB Singapore Ltd. v. United States,* 15 CIT 590, 780 F.Supp. 823 (1991), states that ITA may decline to follow its regulations for a "compelling reason." *Id.* at 594, 780 F.Supp. at 827. The cases cited by ITA for this proposition do not support it. In fact, the court in *NMB Singapore* required ITA to follow its regulation. *Id.* at 595, 780 F.Supp. at 827. Thus, the statement was *dictum.* Precedents, procedures and practices may be disregarded for a variety of reasons, as the cases mentioned in *NMB Singapore* and those cited by the government indicate. *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 41–42, 103 S.Ct. 2856, 2865–66, 77 L.Ed.2d 443 (1983).

Regulations are *laws.* If they are valid they must be followed, until properly rescinded.

ITA made no finding of fraudulent activity, nor did it find "unrepresentativeness" or lack of a *bona fide* transaction. ITA decided, after examining all facts, to grant Chang Tieh a zero rate. *Final Results,* at 53,722. If ITA's concerns as to the reliability of the underlying data were not serious enough to result in imposition of a dumping margin, they should not lead ITA to ignore the lack of a margin altogether. Chang Tieh was excluded from the order and should not be treated as if it was assigned an antidumping duty rate that may be reviewed at any time. The court declines to address the issue of whether ITA could commence a changed cir-cumstances review, as opposed to commenc-ing a new dumping investigation, if Chang Tieh is later alleged to be dumping. That is, the certification may be surplusage. As no subsequent dumping is currently alleged, this issue is not before the court.

### CONCLUSION

Avesta's motion for judgment on the agen-cy record is denied. ITA's determination with respect to the treatment of allegedly unrepresentative sales, duty drawback ad-justment and allocation of costs is sustained. The adjustment to U.S. price to account for VAT is upheld despite ITA's decision not to perform a pass-through analysis. Adjust-ments to foreign market value based on VAT were improper, but remand is not requested for this factor alone. Chang Tieh's motion for judgment on the agency record is grant-ed. The certification is invalid and may not be relied on by ITA to commence an adminis-trative review of Chang Tieh. Any such review must have another basis.

### JUDGMENT

This case having been submitted for deci-sion and the Court, after deliberation, having rendered a decision therein; now, in con-formity with that decision,

**IT IS HEREBY ORDERED:** that the motion of Avesta Sheffield, Inc., et al. for judgment upon the agency record is denied;

**IT IS FURTHER ORDERED:** that the motion of Chang Tieh Industry Co., Ltd. for judgment upon the agency record is granted and this case is remanded to ITA with directions that ITA publish an amended antidumping duty order excluding Chang Tieh unconditionally.